1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

MANUEL SANCHEZ-PEDRAZA,

Defendant.

Case No.  21-cr-00439-BLF-3

**ORDER DENYING MOTION TO SUPPRESS**

[Re:  ECF No. 75]

After an extended drug-trafficking investigation and wiretaps led officers to learn that a transaction for 20 kilograms of methamphetamine would occur on August 18, 2021 at an apartment complex in Santa Clara, investigators quickly planned surveillance of that complex. The investigative team enlisted a local uniformed police officer in a marked vehicle to be on call to stop any vehicle that ultimately drove away with suspected contraband.  As expected, the transaction occurred, and a large black plastic garbage bag ended up in the trunk of a white GMC Yukon that drove away from the scene.  The officer followed, observed the Yukon commit two traffic violations, and pulled the vehicle over.  After telling the driver, then identified as Defendant Manuel Sanchez-Pedraza, that he was stopped for traffic violations (and not mentioning the drug investigation or surveillance), the officer summoned a K-9 unit which alerted on the trunk of the vehicle.  The officer discovered 20 kilograms of methamphetamine in the garbage bag in the trunk.

Now before the Court is Sanchez-Pedraza's motion to suppress the 20 kilogram bag of methamphetamine because it was allegedly obtained in violation of the Fourth Amendment.  *See* ECF No. 75 ("MTS"); *see also* ECF No. 79 ("Reply").  The Government opposes.  *See* ECF No. 77 ("Opp.").  The Court held an evidentiary hearing on the motion on May 3, 2022.  ECF No. 82.

1    For the reasons stated below and on the record at the hearing, the motion is DENIED.

2    **I.    BACKGROUND**

3        **A.    Investigation and A Lead on a Drug Transaction**

4        In late 2020, an investigation began into what officials termed the "Verduzco Drug

5    Trafficking Organization." 5/3 Hrg. Tr. ("Tr.") 21:13–17. As part of that investigation, in August

6    2021, officials obtained wiretaps on targeted phones. ECF No. 77-1 ("Fachko Decl.") ¶ 4; Tr.

7    21:17–22. The wiretap intercepted a call between a suspected drug trafficker ("Alex") and an

8    individual later identified as co-defendant Jose Banuelos-Garcia. Fachko Decl. ¶ 5; Tr. 21:25–

9    22:9. On the call, the two discussed a sale of 20 kilograms of methamphetamine for $1,950 per

10   kilogram, for a total value of approximately $39,000. Fachko Decl. ¶ 5; Tr. 22:5–9. The two

11   agreed the transaction should occur at Banuelos-Garcia's residence at midday the next day, August

12   18, 2021, and Banuelos-Garcia suggested that he would be taking the methamphetamine to

13   another person as a broker. Fachko Decl. ¶ 5. Investigators obtained a ping warrant, determined

14   that Banuelos-Garcia likely lived at an apartment complex on Harvard Avenue in Santa Clara, and

15   planned to surveil the exchange. Fachko Decl. ¶ 6; Tr. 24:3–12.

16       As part of the surveillance, the team decided they would need a local uniformed officer in

17   a marked vehicle, in addition to other members of the team. Fachko Decl. ¶ 8; Tr. 25:20–26:2.

18   The officer would, if needed, be enlisted to make a "wall stop" of any vehicle that left the scene

19   with suspected contraband. A "wall stop" is a stop by a uniformed officer based on a ruse (i.e., an

20   alleged traffic violation) that occurs without tipping off the target that the stop was actually part of

21   a covert investigation (i.e., the drug-trafficking investigation). Fachko Decl. ¶¶ 8, 23–24; Tr.

22   7:12–19. Wall stops are routinely used as part of drug-trafficking investigations to make the stop

23   appear to the suspect to be a result of bad luck rather than targeted pursuit. Fachko Decl. ¶ 24; *see*

24   *also* Tr. 26:7–27:1 (Officer Fachko explaining that wall stops are used "so you don't alert the

25   people that you are contacting on the smaller investigation, the smaller stop, to the larger

26   investigation").

27       The morning of the suspected transaction, the team held a briefing at the Santa Clara Police

28   Department. Fachko Decl. ¶ 7; Tr. 24:13–25:6. Officer Dave Britton of the Santa Clara Police

United States District Court
Northern District of California

2

United States District Court
Northern District of California

1    Department, who had previous experience in both narcotics and traffic enforcement, was asked to

2    be the local uniformed officer.  ECF No. 77-4 ("Britton Decl.") ¶¶ 1, 3–5; Tr. 5:24–6:7.  Officer

3    Britton was briefed on the investigation, including that (1) a drug transaction was to happen that

4    day and that (2) Banuelos-Garcia was likely to transfer the contraband to an unknown individual

5    after the initial transaction occurred.  Fachko Decl. ¶ 9; Britton Decl. ¶¶ 3, 5; Tr. 6:24–7:7.

6    Officer Britton was told to be stationed nearby and given the radio channel so he could listen to

7    communications as they happened and possibly initiate a wall stop.  Fachko Decl. ¶¶ 10–11;

8    Britton Decl. ¶ 4; Tr. 7:3–8:18.  Officer Britton had been involved in approximately 10 different

9    wall stop operations in his career.  Tr. 7:20–23.  Officer Britton parked on a side street near

10   Pruneridge Avenue to the west of Lawrence Expressway and listened on the radio as the operation

11   unfolded.  Britton Decl. ¶¶ 6, 11.

12          **B.     Surveillance**

13          Officers gathered to surveil the apartment complex in the late morning on August 18.  Tr.

14   30:1–11.  During the surveillance operation, members of the team communicated via radio.  *See*

15   Fachko Decl. Ex. B ("Radio Comm.) (audio recording of radio communications).  Agents

16   observed Raul Jimenez-Verduzco, whom they already suspected of being in the drug-trafficking

17   organization, park near the apartment complex.  Fachko Decl. ¶ 13; Radio Comm. 8:05–8:59.

18   About twenty minutes later, another individual (later identified as Banuelos-Garcia) arrived and

19   began chatting with Jimenez-Verduzco.  Fachko Decl. ¶ 14; Tr. 30:22–31:1.  From his own

20   vehicle, Jimenez-Verduzco removed a large black plastic bag and placed it in the trunk of

21   Banuelos-Garcia's vehicle.  Fachko Decl. ¶ 14; Radio Comm. 12:50–13:25.

22          After getting back in his vehicle, Banuelos-Garcia drove into a nearby parking lot and

23   parked next to a white GMC Yukon.  Fachko Decl. ¶ 15; Britton Decl. ¶ 9; Tr. 31:8–13.  The

24   surveillance team observed a then-unknown individual wearing a red hat and dark shirt, later

25   identified as Sanchez-Pedraza, open the trunk of the Yukon.  Fachko Decl. ¶ 15; Radio Comm.

26   14:23–14:33.  Banuelos-Garcia then placed what appeared to be the same black plastic trash bag

27   into the trunk of Sanchez-Pedraza's Yukon.  Fachko Decl. ¶ 15; Radio Comm. 14:11–14:16; Tr.

28   31:13–17.  Members of the surveillance team captured photographs of (1) Banuelos-Garcia with

3

United States District Court
Northern District of California

1   the black garbage bag and (2) Banuelos-Garcia and Sanchez-Pedraza standing next to each other

2   as Sanchez-Pedraza shut the trunk of the Yukon.  Fachko Decl. ¶ 16 & Ex. A (photographs).

3   Sanchez-Pedraza got back in his vehicle and drove away.  Fachko Decl. ¶ 15; Radio Comm.

4   14:50–15:05; Tr. 31:20–21.  Officer Britton responded affirmatively when he was asked if he

5   "copied" that the surveillance team saw Sanchez-Pedraza drive towards Highway 280.  Britton

6   Decl. ¶ 10; Radio Comm. 16:00–16:08; Tr. 9:14–25.  Britton followed.

7        **C.**    **Wall Stop**

8        Officer Britton identified the Yukon based on the description of the vehicle from the

9   surveillance team, its license plate, and audio confirmation from the team on the radio.  Britton

10   Decl. ¶¶ 11–12, 15; Radio Comm. 16:08–17:06; Tr. 12:1–8.  Although he was not explicitly told

11   to stop the vehicle, Officer Britton understood that his role on the team that day was to conduct a

12   wall stop.  Britton Decl. ¶ 12.  Officer Britton observed the Yukon commit two state law traffic

13   violations and initiated a stop of the vehicle.  Britton Decl. ¶¶ 13–14; Tr. 10:1–21, 11:3–6.  He told

14   Sanchez-Pedraza that he had been pulled over for (1) making a lane change without signaling, and

15   (2) going 67 miles per hour in a 65 miles per hour zone.  Britton Decl. ¶¶ 13–14; *see also* ECF No.

16   76 (bodyworn camera footage from Officer Britton).  Officer Britton did not mention to Sanchez-

17   Pedraza the drug investigation or that he was conducting a "wall stop."

18        After running Sanchez-Pedraza's license and registration, Officer Britton summoned a K-9

19   unit that had been stationed in the area in anticipation of the stop.  Fachko Decl. ¶ 23.  The K-9

20   alerted to the front of the car and the black garbage bag in the trunk.  Britton Decl. ¶ 21; *see also*

21   ECF No. 76 (bodyworn camera footage from K-9 officer).  On opening the black plastic trash bag,

22   Officer Britton discovered 20 kilograms of white crystal methamphetamine in 20 separate single

23   kilogram bags.  Britton Decl. ¶ 19; Fachko Decl. ¶ 22 & Ex. A.

24        Officer Britton did not mention the drug investigation in the police report he filled out after

25   the wall stop.  Britton Decl. ¶ 22; Tr. 13:3–15.

26        **D.**    **Indictment and Procedural History**

27        Sanchez-Pedraza, Jimenez-Verduzco, Banuelos-Garcia, and Edgar Portillo were indicted

28   on November 4, 2021 on drug trafficking charges.  *See* ECF No. 11.  Sanchez-Pedraza filed the

United States District Court
Northern District of California

1    instant motion to suppress on April 1, 2022.  *See* MTS.  The Government filed its opposition two

2    weeks later.  *See* Opp.  The Court held an evidentiary hearing on May 3, 2022, during which

3    Officer Fachko and Officer Britton testified.  ECF No. 3.  Trial has not been set.

## II.    DISCUSSION

5            Sanchez-Pedraza argues that Officer Britton lacked probable cause to initiate the stop,

6    which Officer Britton did not justify by explicit reference to the drug investigation either to

7    Sanchez-Pedraza or in his report.  MTS at 6–8.  Sanchez-Pedraza says that even if the officer was

8    justified in initially stopping him, calling the K-9 unit unreasonably prolonged the detention

9    without reasonable suspicion.  *Id.* at 8–12.  The Government responds that Officer Britton had

10   probable cause to conduct a wall stop both (1) because he attended the pre-surveillance briefing

11   and listened to radio communications while the surveillance was occurring, and (2) because other

12   officers who had knowledge of the investigation enlisted him to conduct the stop.  Opp. at 4–8.

13   Because the stop was a wall stop whose purpose is to look for drugs under the ruse of a traffic

14   stop, the purpose of the stop was not prolonged by calling the K-9 and Officer Britton did not need

15   to disclose the purpose of the stop either to Sanchez-Pedraza or in his report, the Government

16   contends.  *Id.* at 10–11.

17           "The Fourth Amendment permits investigatory stops [of a vehicle] if the facts known to

18   the officers established 'reasonable suspicion to believe that criminal activity may be afoot.'"

19   *United States v. Magallon-Lopez*, 817 F.3d 671, 674 (9th Cir. 2016) (quoting *United States v.*

20   *Arvizu*, 435 U.S. 266, 273 (2002)).  And officers may conduct a warrantless search of a vehicle if

21   they have probable cause—when "acts and circumstances are sufficient to warrant a reasonable

22   person to conclude that contraband or evidence of a crime will be found."  *United States v. Ibarra*,

23   345 F.3d 711, 716 (9th Cir. 2003).  The Government contends that Officer Britton had two

24   independent sources of probable cause:  (1) his own probable cause as a member of the

25   investigative team who attended the pre-surveillance briefing and listened to the radio

26   communications during the surveillance of the drug transaction; and (2) probable cause under the

27   collective knowledge doctrine based on the knowledge of the team of officers involved in the

28   investigation who enlisted him to make the traffic stop.  Opp. at 4–8.  The Court agrees on both

5

1    accounts.

2        First, Officer Britton had probable cause because he actively listened to the surveillance as

3    a member of the investigative team.  That morning, Officer Britton was briefed about the

4    wiretapped phone call that revealed that contraband would be exchanged between a known

5    trafficker (later identified as Jimenez-Verduzco), a broker (later identified as Banuelos-Garcia),

6    and an unknown third-party (later identified as Sanchez-Pedraza).  Britton Decl. ¶¶ 3, 5; Tr. 6:24–

7    7:7.  The traffickers showed up at the time and place stated on the phone call.  Over the radio,

8    Officer Britton heard the surveillance team say that a large black plastic trash bag was exchanged

9    first from Jimenez-Verduzco to Banuelos-Garcia, and then from Banuelos-Garcia to Sanchez-

10   Pedraza.  Radio Comm. 12:50–13:25, 14:11–14:16.  The surveillance team conveyed that make,

11   model, color, and license plate of the vehicle over the radio.  Britton Decl. ¶¶ 11–12, 15; Radio

12   Comm. 16:08–17:06; Tr. 12:1–8.  Officer Britton pursued the car that matched that description

13   and received confirmation from a different surveillance vehicle that he was following the correct

14   car.  And he then pulled over that vehicle.  These are more than sufficient "acts and circumstances

15   . . . to warrant a reasonable person to conclude that contraband or evidence of a crime will be

16   found" upon a search of the vehicle.  *Ibarra*, 345 F.3d at 716.

17       Second, even if Officer Britton did not have his own probable cause as a member of the

18   surveillance operation, the collective knowledge doctrine provides an independent ground for

19   probable cause.  The collective knowledge doctrine applies "where an officer (or team of officers),

20   with direct personal knowledge of *all* the facts necessary to give rise to reasonable suspicion or

21   probable cause, directs or requests that another officer, not previously involved in the

22   investigation, conduct a stop, search, or arrest."  *United States v. Ramirez*, 473 F.3d 1026, 1033

23   (9th Cir. 2007).  The collective probable cause of the other officers transfers to the arresting or

24   searching officer who "rel[ies] on an instruction to arrest delivered by other officers possessing

25   probable cause."  *Id.* at 1036.

26       This is frequently the basis for probable cause supporting a wall stop.  *Ramirez*, the

27   principal case on the collective-knowledge doctrine, involved a wall stop on very similar facts as

28   here.  In *Ramirez*, officers conducted surveillance at a residence of suspected drug dealers in Los

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Angeles and followed a vehicle that left that residence.  473 F.3d at 1028.  The vehicle parked, and

2    another vehicle parked alongside it.  *Id.* at 1029.  The individuals from the two vehicles exchanged

3    a "weighted-down gym bag," which was placed in the rear passenger side of the first vehicle.  *Id.*

4    The surveillance team followed that vehicle as it left and requested a uniformed officer to make a

5    "traffic stop" of the vehicle as it was traveling on Interstate 5.  *Id.*  An officer of the Glendale

6    Police Department responded to the request, officers from the surveillance vehicles "pointed out"

7    the suspect vehicle, and the officer stopped the vehicle for "failing to drive within a single lane" in

8    violation of the California Vehicle Code.  *Id.*  A K-9 unit was summoned, and the dog alerted to

9    the narcotics in the rear interior of the vehicle.  *Id.* at 1030.  The Ninth Circuit affirmed denial of a

10   motion to suppress drugs seized from a vehicle, finding that the uniformed officer had probable

11   cause to stop the vehicle based on the collective knowledge of the officers from the surveillance

12   team who had requested him to stop the vehicle.  *Id.* at 1036–37.

13          *Ramirez* is remarkably similar to the situation here.  Members of the surveillance team here

14   developed probable cause that narcotics were exchanged between Jimenez-Verduzco and

15   Banuelos-Garcia, and then Banuelos-Garcia and Sanchez-Pedraza.  After observing Sanchez-

16   Pedraza's vehicle drive away, Officer Britton was asked if he "copied" that the surveillance team

17   saw Sanchez-Pedraza drive towards Highway 280, and he responded affirmatively.  Britton Decl.

18   ¶ 10; Radio Comm. 16:00–16:08; Tr. 9:14–25.  Officer Britton then proceeded to stop the vehicle

19   for traffic infractions without revealing the actual source of the probable cause.  Britton Decl.

20   ¶¶ 13–14, 22; Tr. 13:3–15.  And a K-9 unit summoned during the purported traffic stop alerted to

21   the contraband in the vehicle.  Britton Decl. ¶ 21.  The collective knowledge doctrine thus

22   provided Officer Britton with probable cause from the surveillance team's observations of

23   Sanchez-Pedraza.

24          Sanchez-Pedraza's arguments that Officer Britton lacked probable cause to stop him are

25   not persuasive.  First, Sanchez-Pedraza argues that officials investigating the drug trafficking

26   organization did not know him prior to this incident, and that the initial parts of the drug buy (such

27   as the phone call and all of the wiretaps) did not involve Sanchez-Pedraza.  *See* Reply at 2–3.  But

28   probable cause is assessed "in light of the totality of the circumstances."  *United States v. Brooks*,

7

1    610 F.3d 1186, 1193 (9th Cir. 2010).  Even if investigators did not know about Sanchez-Pedraza

2    until they observed him receive a large black plastic trash bag from suspected drug traffickers,

3    their observations from when they first saw Sanchez-Pedraza until Officer Britton initiated the

4    wall stop were sufficient to give them probable cause to stop him.

5            Second, Sanchez-Pedraza argues that Officer Britton never mentioned to him or in his

6    police report that the stop was conducted pursuant to the investigation, and thus that Officer

7    Britton cannot rely on those facts as grounds for probable cause.  Reply at 4.  Revealing that the

8    stop was a wall stop, however, would have defeated the purpose of the wall stop.  As the officers

9    testified, wall stops are used "so you don't alert the people that you are contacting on the smaller

10   investigation, the smaller stop, to the larger investigation."  Tr. 26:7–27:1.  Telling Sanchez-

11   Pedraza that he was pulled over because of what the surveillance had revealed would have tipped

12   him off to the drug investigation, and he could have told others who may have still been under

13   covert surveillance about the investigation's existence.  Explaining the investigation in the police

14   report about the stop could have been just as damaging because Sanchez-Pedraza could have

15   obtained the police report himself.  Tr. 60:4–11.  Officer Britton was thus not required to tell

16   Sanchez-Pedraza of the true reason for the stop or to have independent reasonable suspicion (such

17   as from the traffic infractions) to stop Sanchez-Pedraza.  *See Magallon-Lopez*, 817 F.3d at 675

18   (stop supported by undisclosed probable cause lawful "even if the officer falsely cites as the basis

19   for the stop a ground that is not supported by reasonable suspicion").

20           Third, Sanchez-Pedraza argues that Officer Britton cannot rely on the collective knowledge

21   doctrine under *Ramirez* because no officer made an express order or request to Officer Britton to

22   "conduct a wall stop" of Sanchez-Pedraza.  Reply at 5–6.  But this argument runs headlong into

23   *Ramirez* itself, which cited cases approving of searches or stops where there was no indication of

24   "the substance of any communication" from the officers with probable cause to the stopping or

25   searching officer.  *See Ramirez*, 473 F.3d at 1034 (citing *Illinois v. Andreas*, 463 U.S. 765, 772

26   (1983)).  Even setting this aside (and setting aside Officer Britton's own knowledge of the facts

27   underlying Sanchez-Pedraza's situation), Sanchez-Pedraza does not cite to any case requiring

28   officers to use the magic words "wall stop" or to expressly order an officer to conduct the stop.

United States District Court
Northern District of California

8

1    Officer Britton knew his role in the operation was to conduct a wall stop if a vehicle known to be

2    carrying contraband left the scene of the buy.  Tr. 15:19–23.

3            Finally, Sanchez-Pedraza argues that even if the stop was initially justified, it became

4    unreasonably and impermissibly prolonged because Officer Britton exceeded the scope of the

5    traffic stop by calling the K-9 unit to conduct a sniff on the vehicle without additional reasonable

6    suspicion.  MTS at 8–12.  But as the Government points out in opposition, the "tolerable duration

7    of police inquiries in the traffic-stop context is determined by the seizure's 'mission.'"  *Rodriguez*

8    *v. United States*, 575 U.S. 348, 354 (2015).  As the Court has determined, the "mission" of the

9    stop was a wall stop, not to stop for a traffic violation.  The stop was justified by probable cause

10   that Officer Britton and the surveillance team had developed while observing the suspected drug

11   transaction in the hour before the stop, and the K-9 unit was brought to determine if the vehicle in

12   fact contained drugs.  The stop was thus not prolonged by use of the K-9 unit.

**III.    ORDER**

14           Officer Britton's wall stop of Sanchez-Pedraza was supported by probable cause, and the

15   stop was not prolonged when Officer Britton called for a K-9 unit to investigate Sanchez-

16   Pedraza's vehicle.  For the foregoing reasons, IT IS HEREBY ORDERED that Sanchez-Pedraza's

17   motion to suppress is DENIED.

19   Dated:  May 18, 2022

     BETH LABSON FREEMAN
     United States District Judge

United States District Court
Northern District of California

9